**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMES ANTHONY,

     Plaintiff,

v.

MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES, ARON SOUSA,
*in his individual and official capacity,* and
DAWN MISRA, *in her individual and official
capacity,*

     Defendants.

Case No.

Hon.

---

David A. Nacht (P47034)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com

---

**PLAINTIFF'S FIRST COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff JAMES ANTHONY ("Plaintiff"), by and through his attorneys,

NACHTLAW, P.C., and hereby alleges as follows:

**INTRODUCTION**

1.     Plaintiff's claims arise out of the deprivation of his federal due process right by

Defendants, resulting in his removal as Principal Investigator ("PI") on a five-year, $1.4 million

research grant from the National Institutes of Health ("NIH") that had been awarded based on

Plaintiff's professional expertise and hard work.

2.     Despite his two-decade-long career at Michigan State University ("MSU"), and

after Plaintiff attempted to collect the long-delayed final payment of $50,000 in research funding

promised in his retention offer from the University, Defendants declined to fulfill its promise, brought forth baseless accusations against him, and falsely represented Plaintiff to the NIH in order to summarily strip him of his ability to complete the research projects, mentoring, and training activities he had designed and obtained millions of dollars in funding for, obstructed his ability to obtain any new funding for over a year following, and subjected him thereafter to the cascading professional, financial, psychological, and emotional consequences thereof.

3.      When Plaintiff attempted to pursue a grievance process to correct Defendants' flagrant errors, his complaint was improperly classified as "minor misconduct" in order to avoid affording Plaintiff the full extent of due process protections he was entitled to.

4.      Defendants' actions also resulted in the loss of thousands of dollars of income from work on the applicable research and ultimately the serious obstruction of Plaintiff's career and work generally.

## PARTIES, JURISDICTION, AND VENUE

5.      Plaintiff James Anthony is a Professor of Epidemiology and Biostatistics at MSU and an individual residing in East Lansing, Ingham County, Michigan.

6.      Defendant Michigan State University Board of Trustees is the publicly elected governing body of the school, a publicly funded and state-operated university located in East Lansing, Ingham County, Michigan which receives state and federal funding for the provision of higher education.

7.      Defendant Aron Sousa is the Dean of the MSU College of Human Medicine ("CHM"). He is sued in his individual and official capacity.

8.      Defendant Dawn Misra is the Chair of the MSU CHM Department of Epidemiology and Biostatistics. She is sued in her individual and official capacity.

2

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

10.     Venue is proper in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 621 et seq., as this is the judicial district in which Defendants operate, and in which the wrongs alleged herein occurred.

## FACTUAL ALLEGATIONS

### Plaintiff's Background

11.      Plaintiff has been a tenured Professor in the Department of Epidemiology (recently re-named Epidemiology & Biostatistics) at CHM since 2003.

12.     Plaintiff's compensation, livelihood, and continued employment at MSU depends upon his sustained success as a leader of research projects, science education, research mentoring, and research training programs that are funded by the United States National Institutes of Health ("NIH") and other non-MSU foundations and funding institutions.

13.     Since 2009, Plaintiff's only summer salary income, for the time between May 16th and August 15th every year has come from MSU-sanctioned NIH awards.

14.     Plaintiff has had a national and internationally recognized track record of year-in-year-out success in securing NIH awards of millions of dollars for his innovative and field-influencing research activities for more than 40 years.

15.     Prior to being recruited by MSU to join its medical school faculty, Plaintiff had been a tenure-stream and tenured faculty member at Johns Hopkins University ("JHU") for more than 20 years, with an initial Assistant Professor appointment in the JHU School of Hygiene and Public Health in 1978, subsequent promotions concurrent with growth in his NIH successes, and eventual appointment in the JHU School of Medicine.

16.    Plaintiff's contributions to JHU continue to be recognized; for example, in 2014, he was elected as a member of the JHU Society of Scholars (*see* https://msutoday.msu.edu/news/2014/james-anthony-named-member-of-johns-hopkins-society-of-scholars).

17.    Plaintiff continues to hold a JHU professorial appointment as Adjunct Professor.

18.    Plaintiff's successes have only continued since joining MSU, receiving the 2018 MSU William J. Beal Outstanding Faculty award, winning two elections by the MSU College of Human Medicine faculty to serve as a Member and Chairman of the Conflict of Interest Committee, being elected in 2024 to serve as the College of Human Medicine representative to the University Faculty Senate and the University Council, and receiving the October 2024 Steven Banks Award for "Generous and Collegial Mentoring of Behavioral Health Colleagues and Students" from the American Public Health Association.

19.    Plaintiff continues to be a leader, most recently receiving MSU's 2025 Excellence in Diversity, Equity and Inclusion Award (hereinafter referred to as the "EDEIA").

20.    As described by University employees, "the EDEIA is an award program that began in 1990, one of the first of its kind in the nation. The purpose of the program is to recognize the exceptional and innovation contributions of MSU students, staff, and faculty in advancing diversity, equity, and inclusion in the areas of teaching, research, programming, service, community outreach, and organizational change."

21.    Before recruitment by MSU to join its medical school faculty in 2003, Plaintiff had benefitted from the support of NIH awards to fund his research activities each year since 1980.

22.    Plaintiff's track record of consistent leadership of NIH-funded research activities included a continuing series of awards each year between 1986 and 2022, until accusations

4

communicated to NIH officials by Defendants in Spring of 2022 led to his removal from all NIH and other externally funded science leadership activities and loss of income for all summer periods.

23.    Many external evaluations of Plaintiff's leadership and success in research activities exist; these evaluations include: (i) an independent audit, in 2003, of his scientific contributions and their influence in psychiatric epidemiology and the biomedical and social sciences (*see* https://publichealth.jhu.edu/2003/isi-highly-cited); (ii) his election in 2001 to serve from 2001 through 2008 as Chair of the World Psychiatric Association Section on Epidemiology and Public Health; (iii) his more recent designation as one of the top scientists in medicine at MSU (*see* https://research.com/university/medicine/michigan-state-university); and (iv) multiple awards for his scientific contributions, mentoring/guidance of research trainees and investigators in early career stages, and leadership of multiple research training and mentoring programs at JHU and MSU.

### Plaintiff's Recruitment and by
### Defendant University and its Retention Promises

24.    In the early 2000s, Plaintiff was contemplating a departure from JHU and the possibility of spending the remainder of his academic career at MSU.

25.    Because JHU did not want to see Plaintiff leave, the institution offered him an official leave of absence from late 2003 through late 2008 so that he could return to his tenured professorship at JHU with little difficulty.

26.    During 2007-2008, Plaintiff raised his potential return to JHU with his department leadership at MSU due to budgetary issues at CHM, including constraints on promises MSU had made in 2003 about new faculty hires and new initiatives for NIH-focused research projects and research training activities that included allocation of space for planned department-specific research laboratories and research training programs.

27.     Instead of the prior promised budget increases, Plaintiff was having to cope with and adjust to reductions.

28.     During these discussions, MSU administration sent Plaintiff an official letterhead "retention offer" that included the promises of three tranches of $50,000 to support his own and the department's research activities.

**Defendants Interfere with Plaintiff's Retention Promises**

29.     Plaintiff accepted this retention offer and received the first two tranches as expected, but after Defendant Sousa replaced the former Dean of CHM as Interim Dean, the final $50,000 was delayed, and Plaintiff was asked to allow for further unspecified delay before the final tranche was paid out.

30.     On or around 2018 or 2019, Plaintiff decided he had waited for the funding long enough and asked to receive the final retention payment, at which point Defendants informed him he would not be receiving it.

31.     Plaintiff was informed that he would have to spend other available funds because the $50,000 retention payment would not be made if other funds were available.

32.     This was confusing to Plaintiff as these things were not related.

**Defendants Improperly Retaliate Against Plaintiff for Pushing for What He Deserved and Deprive Him of His Due Process Rights**

33.     Thereafter, Plaintiff received a letter of reprimand accusing him of unspecified "inappropriate behaviors."

34.     This accusation eventually morphed into alleged "professionalism" offenses, whereby Plaintiff was accused of purported "bullying," "intimidation," and "disrespect."

35.     Similar types of accusations were repeated in a letter from Defendant Misra in Spring 2021, at which time the Plaintiff asked for a meeting with Defendant Misra to clarify potential misunderstandings.

36.     Despite repeated requests by the Plaintiff for such a meeting, Defendant Misra refused to meet with him.

37.     Then, on or about January 6, 2022, Defendant Misra sent the Plaintiff an "intent to discipline" email based on this stream of accusations, still without presenting Plaintiff with any evidence of these alleged violations.

38.     Despite the shifting nature of the accusations, Plaintiff was still given no clear or adequate explanation of the details of his supposed offenses – which allegedly took place at the height of the COVID pandemic, when no in-person (or even Zoom-based) interactions were occurring in his work.

39.     In a meeting with Defendant Misra on January 13, 2022 – which was supposed to have occurred before the notification on January 6, 2022 – Plaintiff was not told with any specificity what he was being accused of, nor was he given exact information on how the process would proceed.

40.     Plaintiff repeatedly insisted that he be given tangible evidence of wrongdoing *and* copies of the policies that applied to the situation; this information was not provided.

41.     This meeting did not result in Plaintiff having a better understanding of the accusations against him.

42.     In a subsequent meeting on February 11, 2022, Plaintiff was given University representation, the chairperson of the Personal Subcommittee of the University Committee on

Faculty Affairs, who did not advocate for Plaintiff or even get more specifics about the allegations brought against him.

43.     This meeting was supposed to serve as a mediation, as a venue for identifying alternative solutions and course of action, but Defendants simply approached the task performatively and did not engage in good faith negotiations.

44.     Throughout this convoluted and misshapen process, Plaintiff was not allowed to explore alternative courses of action as indicated in the *written* policy Defendants should have been following.

45.     Without ever being made aware of what the evidence – or even the exact allegations – against him were, sometime in February 2022, Defendant Misra called Dr. Kathy Etz at the NIH's National Institute on Drug Abuse (hereinafter referred to as "NIDA") and left a voicemail where she indicated that she was removing Plaintiff as a R25 PI.

46.     Plaintiff was not previously made aware that such a call would occur.

47.     Plaintiff would not find out about this call for *months;* he would later learn of this call and subsequent emails from Defendant Misra to Dr. Etz.

48.     Furthermore, upon reasonable belief, Defendants did not follow NIH's own policies for reporting of misconduct.

49.     Despite Plaintiff's filing of a grievance/appeal on or about March 17, 2022, because Defendants classified MSU's discipline as "minor misconduct" pursuant to the MSU Faculty Handbook, Section IV, Academic Human Resources Policies regarding discipline of tenured faculty, he had no recourse to an independent review of the evidence.

50.     Nonetheless, it was not until Plaintiff filed that grievance that he ever saw any of the alleged evidence against him, all of which turned out to be some emails exchanged during the COVID pandemic.

51.     These emails did not include any foul or rude language, simply questions and suggestions about how to adapt to the pandemic-caused shutdown via procedures and processes.

52.     The decision to classify MSU's discipline as "minor" was made to avoid affording Plaintiff the full extent of his due process rights.

53.     Defendant MSU notified Plaintiff on April 19, 2022, that his grievance was dismissed on "jurisdictional" grounds.

54.     Plaintiff responded to the dismissal on May 23, 2022, flagging for Defendant University his serious concerns that he had been deprived of his due process rights, which were then forwarded for an additional grievance review.

55.     While Plaintiff's grievance was still, based on his understanding, pending, he was officially notified that his NIH activity would be negatively impacted.

56.     Nonetheless, Plaintiff was also instructed by the Contracts and Grants Office to continue NIH project work.

57.     Plaintiff followed this instruction yet has not been paid by MSU for project work between May 16, 2022 and late June 2022.

58.     Later, on or about June 29, 2022, Plaintiff was then told that the grievance panel had met, did not review any evidence from Plaintiff, and found Defendants to not have violated any policy.

59.     Plaintiff was not allowed to participate in this process.

60.     After dismissing Plaintiff's grievance, and after classifying this situation as "minor" disciplinary action, in mid-2022, Defendants nonetheless contacted the NIH and had Plaintiff removed as PI on a five-year $1.4 million NIH research grant he had won after an independent peer review panel had found his intellectual property and ideas to be meritorious.

61.     Defendants pursued these actions against Plaintiff in total disregard of the MSU Procedures Concerning Allegations of Misconduct in Research and Creative Activities, which require at Section IV(h) that a review by the MSU Research Integrity Officer of allegations of research misconduct and/or unacceptable research practices "shall precede all other internal University proceedings against a Respondent that relate to or arise out of the alleged Misconduct, including, without being limited to, disciplinary, anti-discrimination, and grievance proceedings."

62.     Whereas review under the Research Misconduct Procedures would have entitled Plaintiff to a preliminary assessment, and then, as appropriate, an independent inquiry, an independent investigation with presentation of evidence and testimony, and an appeal – not to mention recourse to policies and procedures concerning bad faith accusations – he was instead denied any process whatsoever before his removal from an extremely valuable grant he had worked hard to obtain for a project he had worked hard to develop.

63.     Plaintiff also later learned from a contact at NIH that for some portion of 2023, his name appeared on a list of experts who no longer could serve on NIH peer review panels.

64.     When he asked his NIH contact why, the contact responded that no explanation had been given.

65.     He received an email on March 28, 2023, which indicated that "the period of one year ha[d] passed and Dr. Gage has determined that [Plaintiff was] permitted to submit grants again at MSU."

66.     However, the damage was irrevocably done; besides Defendants continuing to obstruct Plaintiff's ability to apply for additional NIH grants until early 2024, his reputation was damaged, and Plaintiff struggled to secure new grants after the suspension period.

67.     In the same email referenced above, Plaintiff was told that "the NIH ha[d] requested that MSU periodically monitor [Plaintiff's] interactions with the pre-award team and the department of one year."

68.     To this day, Plaintiff does not know why NIH has requested periodic monitoring.

69.     To this day, Plaintiff has not been allowed to see any of the communications about him to the NIH.

70.     Defendant University then implemented a process that impaired his ability to properly secure grants.

71.     In the Spring of 2024, Defendant Misra informed Plaintiff that he would have to vacate the research and research training space, assigned to him since 2003, by the end of the summer because he was no longer a Principal Investigator on any NIH research training programs, a direct result of Defendants' own actions in canceling his NIH award in 2022, thereby removing the funding he had secured for research trainees in that five-year award.

72.     MSU pays employees like Plaintiff during summer months with funds brought from outside sources, like the NIH.

73.     By improperly contacting the NIH and suspending his ability to be a PI, Defendants caused Plaintiff losses in the hundreds of thousands of dollars.

74.     Due to Defendants' actions, furthermore, Plaintiff has been deprived of summer income since 2022.

## COUNT I

11

**VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, 42 U.S.C. § 1983**

75.    Plaintiff incorporates the preceding allegations as if fully restated herein.

76.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deprive any person of life, liberty, or property, without due process of law."

77.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by person acting under the color of law.

78.    Plaintiff had a constitutionally protected interest in his faculty and research positions.

79.    Because the reputational stigma Defendants fostered against Plaintiff is related to his research position and access, he also had a constitutionally protected liberty interest in his good name and reputation, *see Murtha v. Rossford Exempted Vill. Sch.*, No. 21-3449, 2021 WL 4950238, at \*5 (6th Cir. Oct. 25, 2021).

80.    It is "well-settled" for purposes of § 1983 that Plaintiff's constitutionally protected liberty interest in his "reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the Fourteenth Amendment." *Gallow v. Pittis*, No. 2:17-CV-1007, 2019 WL 4192717, at \*4 (S.D. Ohio, Sept. 4, 2019) *(citing Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002)).

81.    Defendants deprived him of the above-listed property and liberty interests, without any procedural basis whatsoever.

82.    Defendants not only deprived Plaintiff of a fair process, they also purposely misclassified Plaintiff's complaint in order to bypass the proper processes that should have been put into motion.

83.     Defendants then *further* deprived Plaintiff of his due process rights when they contacted the NIH, in violation of Defendant MSU's *own* Procedures Concerning Allegations of Misconduct in Research and Creative Activities.

84.     Plaintiff was entitled to due process of law prior to deprivation of his property interests.

85.     Defendants' arbitrary and capricious decision to deprive Plaintiff of these interests without adequate process of law, and, in fact, despite Defendant MSU's own investigation, represents a due process violation.

86.     Defendants acted under the color of state law in making the administrative decision to deprive Plaintiff's constitutionally protected property interests.

87.     A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to deprive him of meaningful due process.

88.     Accordingly, Defendants' actions outlined supra violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; they are therefore not entitled to qualified immunity.

89.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his research position/access; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays that this Honorable Court grant the following remedies:

a.     Award Plaintiff economic damages resulting from Defendants' actions, including but not limited to lost income;

b.        Award Plaintiff noneconomic damages resulting from Defendants' actions, including but not limited to harm to reputation, embarrassment, and emotional distress;

c.        Award Plaintiff exemplary damages;

d.        Award Plaintiff reasonable attorney's fees, costs, and interest;

e.        Award such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ David A. Nacht
David A. Nacht (P47034)
**NACHTLAW, P.C**
*Attorneys for Plaintiff*
501 Avis Dr., Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com

Dated: February 19, 2025

14

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMES ANTHONY,

      Plaintiff,                                            Case No.

v.                                                                Hon.

MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES, ARON SOUSA,
*in his individual and official capacity,* and
DAWN MISRA, *in her individual and official
capacity,*

      Defendants.

---

David A. Nacht (P47034)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com

---

## PLAINTIFF'S JURY DEMAND

NOW COMES Plaintiff JAMES ANTHONY, by and through his attorneys, NACHTLAW,

P.C., and hereby demands a trial by jury in the above-captioned matter for all issues so triable.

                                  Respectfully submitted,

                                  /s/ David A. Nacht
                                  David A. Nacht (P47034)
                                  **NACHTLAW, P.C**
                                  *Attorneys for Plaintiff*
                                  501 Avis Dr., Suite 3
                                  Ann Arbor, MI 48108
                                  (734) 663-7550
                                  dnacht@nachtlaw.com

Dated: February 19, 2025